LAVERNE P. BUTTS, Plaintiff, *v.* SPENCER B. RANDALL, CITY OF JOHNSTOWN and Others, Defendants.

Supreme Court, Fulton County, November 29, 1932.

*Parsons & McClung,* for the plaintiff.

*Alfred D. Dennison, City Attorney,* for the City of Johnstown and the Board of Water Commissioners of the City of Johnstown.

*Fred. Linus Carroll & Son,* for defendants Walker and Tryon Oil Company.

*Harold E. Fritts* [*John S. Woodward* of counsel], for defendant Lone Star Cement Company.

*Horace Heffernan,* for defendant Arthur J. Stockamore.

*Fayette E. Moyer,* for defendant McGuire-Tymeson Company.

*Irving S. Devorsetz* [*Frances E. Preston* and *Thomas J. McCarthy* of counsel], for defendants John Young, Miller Equipment Company, Joseph Singer, Charles Randall, Claude Pidge, Dominick Morgan, James Ten Eyck, Leon Nadon, Tony Jordon, referred to in the complaint as Charles Black.

*Maider & Maider,* for defendants Fonda, Johnstown and Gloversville Railroad Company, Morrell Vrooman, Inc., Joseph L. Sandfordt, Pioneer Building Supply Co., Inc., and Frank Clemente.

*Edward K. Cassedy,* for defendant Charles E. Lair.

*Sidney G. Rosenthal,* for defendants Leflar & Glenar, Swartz, Scribner, Dingman, Knapp, Frasier, Rumrill, Manzer, Simonds, Suits & More, Travis & Ockzo, Snyder & Way, Gage, Trevett, Wart, Travis, Kane, Williams, Philip Carey Company, Tallmadge & Pump, W. J. Dunham and Sterling Vedder.

*Blodgett & Smith* [*William D. Smith* of counsel], for defendants Arclous Biron and Official Purchase Corporation.

*A. C. Haughton,* for defendants Moynehan, Ravanzzino, W. F. Briggs and R. W. Briggs.

*Ainsworth & Sullivan* [*Charles B. Sullivan* of counsel], for defendant National Surety Company.

*Nelson B. Pirnie,* for defendant Spencer B. Randall.

*Thomas F. McDermott,* for defendant Welsh & Grey Lumber Corporation.

ROGERS, J. The plaintiff instituted this action to foreclose a lien on the fund due the defendant Randall, as contractor, from the city of Johnstown on a paving contract. The amount of the fund is in dispute between the contractor and the city. Numerous other liens and assignments have been filed. The surety bond given the city guaranteed the performance of the paving contract and provided that the surety " Shall also pay for all labor performed or furnished and for all materials used in the carrying out of said contracts." All interested parties are joined as defendants. Many questions of law and fact are presented. The issues involve the determination of the amount due the contractor from the city; the amounts due on the various liens filed; the lienability of certain liens; whether certain liens were duly filed; preference between liens; the validity of assignments and their preference and due filing, and ultimately the extent of the liability of the surety. The amount claimed in the liens and assignments is $69,773.31. The fund as admitted by the city is $33,615.77, and as claimed by the contractor $49,671.14. The liens and assignments filed in their order and the amounts thereof are as follows:

| | | |
|---|---|---:|
| 1. | Leflar & Glenar, lien against A. Biron | $519 39 |
| 2. | Willard Swartz, labor lien against A. Biron | 88 50 |
| 3. | Glen Scribner, labor lien against A. Biron | 145 50 |
| 4. | Henry H. Dingman, labor lien against A. Biron | 25 00 |
| 5. | Russell Knapp, labor lien against A. Biron | 22 00 |
| 6. | Marvin Rumrill, labor lien against A. Biron | 8 80 |
| 7. | Gilbert Frasier, labor lien against A. Biron | 35 50 |
| 8. | Hiram Manzer, labor lien against A. Biron | 39 00 |
| 9. | Albert Simonds, labor lien against A. Biron | 33 00 |
| 10. | Joseph Walker, assignment | 6,665 89 |
| 11. | Lone Star Cement Company, assignment | 12,500 00 |
| 12. | Arthur J. Stockamore, assignment | 3,000 00 |
| 13. | Lone Star Cement Company, assignment | 7,000 00 |

| | | | |
|---|---|---:|---:|
| 14. | Laverne P. Butts, lien...................... | $1,217 | 99 |
| 15. | National Surety Company, assignment.......... | 12,000 | 00 |
| 16. | McGuire-Tymeson Co., Inc., lien.............. | 491 | 95 |
| 17. | Art Stone Company, lien..................... | 996 | 85 |
| 18. | Welsh & Grey Lumber Corporation, assignment.. | 505 | 15 |
| 19. | Arclous Biron, lien.. ...................... | 682 | 05 |
| 20. | Official Purchase Corporation, lien............. | 577 | 22 |
| 21. | Almeda Moynehan, assignment................. | 1,775 | 25 |
| 22. | Travis & Ockzo, lien....................... | 832 | 24 |
| 23. | Henry S. Gage, lien......................... | 162 | 75 |
| 24. | Snyder & Way Lumber Company, lien.......... | 41 | 21 |
| 25. | Arthur J. Stockamore, assignment............. | 1,300 | 00 |
| 26. | Robert Travett, lien........................ | 334 | 39 |
| 27. | John Young, assignment..................... | 4,000 | 00 |
| 28. | Miller Equipment Company, order............. | 1,555 | 50 |
| 29. | George Wart, lien........................... | 50 | 00 |
| 30. | Calvin Travis, lien.......................... | 37 | 00 |
| 31. | Joseph Singer, assignment.................... | 516 | 00 |
| 32. | Charles Randall, assignment.................. | 351 | 00 |
| 33. | Claude Pidge, assignment.................... | 170 | 00 |
| 34. | James Ten Eyck, assignment.................. | 81 | 00 |
| 35. | Leon Nadon, assignment..................... | 75 | 00 |
| 36. | Calvin Travis, assignment.................... | 36 | 50 |
| 37. | William Argersinger, assignment............... | 21 | 00 |
| 38. | E. Van Alstyne, assignment.................. | 21 | 00 |
| 39. | Dominick Morgan, assignment................. | 182 | 65 |
| 40. | Blackie, assignment (Dominick Jordan)........ | 85 | 85 |
| 41. | Michael Kane, assignment.................... | 3 | 00 |
| 42. | Andy Myers, assignment..................... | 6 | 00 |
| 43. | George Wart, assignment..................... | 50 | 00 |
| 44. | Fonda, Johnstown and Gloversville Railroad Company, assignment..................... | 1,632 | 36 |
| 45. | Morrell Vrooman, Inc., lien.................. | 1,093 | 21 |
| 46. | Pioneer Builders Supply, Inc., lien............ | 200 | 36 |
| 47. | Frank Clemente, lien........................ | 135 | 00 |
| 48. | Ross F. Williams, lien....................... | 200 | 20 |
| 49. | Joseph L. Sandfordt, lien........·........... | 615 | 00 |
| 50. | Fultonville Foundry Company, lien............ | 180 | 00 |
| 51. | Philip Carey Company, lien.................. | 1,144 | 48 |
| 52. | William J. Dunham, lien..................... | 15 | 50 |
| 53. | J. P. Dugan & Co., lien...................... | 110 | 50 |
| 54. | Peter Ravanzzini, lien....................... | 272 | 70 |
| 55. | Board of Water Commissioners, lien........... | 473 | 50 |
| 56. | Briggs Brothers, lien........................ | 85 | 00 |

| | | |
|---|---:|---:|
| 57. S. Vedder & Co., lien | $194 | 05 |
| 58. Tryon Oil Company, lien | 772 | 66 |
| 59. Tryon Oil Company, assignment | 772 | 66 |
| 60. Great American Indemnity Company, lien | 3,500 | 00 |
| 61. Concrete Steel Company, lien | 45 | 00 |
| | **$69,773** | **31** |

The decision of a few questions of law that have been raised will largely determine the validity of most of the liens and assignments.

*Filing.* It was not necessary to file a lien or an assignment with the city engineer. Section 16 of the Lien Law provides that such assignment shall be filed " with the head of the department or bureau having charge of such construction, and with the financial officer of the municipal corporation or other officer or person charged with the custody and disbursement of the corporate funds applicable to the contract." Section 12 of the statute contains similar language. The contract was with the city acting through its mayor and common council. The common council was the city authority in charge. The mayor was its head and the engineer its agent. Therefore, the filing with the mayor and the city chamberlain was sufficient, or the filing with the city clerk and the chamberlain was sufficient, for the filing with the city clerk was a filing with all the members of the common council including the head.

" The requirement that the notice be filed with the head of the department does not mean that the head of the department must acquire possession of the notice by manual tradition. It means that notice must reach the chief of the department through his designated custodians." (*Albany Builders' Suppy Co.* v. *Eastern Bridge & Structural Co.*, 235 N. Y. 432, at p. 438.)

*Lienability.* (A) *Gasoline, oil and grease.* These are not materials within the meaning and intent of section 5 of the Lien Law. They did not directly enter into the construction of the highway and become absorbed by it. They were applied to and absorbed by machinery. The reasoning in *Shultz* v *Quereau Co.* (210 N. Y. 257) is applicable. There it was decided that coal, used to operate steam rollers and traction engines, was not material furnished for the construction of a highway within a liberal interpretation of the Lien Law. In the *Shultz* case the Court of Appeals approved the following language from another jurisdiction: " Thus it might be argued that upon the same principle coal that is used in portable engines, oil that is used in the lubrication of building machinery, and even food which is eaten by laborers, are all consumed in the construction of the building and hence are lienable materials. But all these

things seem quite plainly distinguishable. They are at least one step further removed from the actual work of construction. They have neither physical contact nor immediate connection with the structure at any time. They are used only to facilitate and make possible the operation of tools, machinery, or men, which in their turn act upon the structure."

It is contended that if the expense of trucking of materials forming a part of the construction is lienable, then fuel and grease used in motor trucks to make possible the hauling should be lienable. There is no satisfactory proof that the gasoline, etc., for which the liens here were filed were used for hauling rather than as fuel for road machinery. Moreover, trucking and hauling are labor and not materials.

(B) *Trucking and hauling of materials.* It has been decided that the expense of trucking and hauling of materials that form a part of the construction is lienable. (*Glens Falls P. Cement Co.* v. *Van Wirt Const. Co.*, 132 Misc. 95, at p. 104; modfd. and affd., 225 App. Div. 159.) But the labor of hauling does not give rise to a preference labor lien, as only laborers for daily or weekly wages have such preference. (Lien Law, § 25, subd. 3.)

(C) *Rental.* The rental of machinery is neither labor nor materials, and is not lienable. It is not " the substance matter of which anything is made." (Webster.)

" A steam shovel, an engine and boiler, picks, shovels, crowbars, and the like, are tools and appliances which, while used in the doing of the work, survive its performance and remain the property of their owner. Not so, however, with materials that are used up in the performance of the work and are thereafter invisible except as they survive in tangible results." (*Troy Public Works Co.* v. *Yonkers*, 207 N. Y. 81, at p. 84.)

The contractor agreed to furnish the plant that was used and at the completion of the work he removed it. The machinery may have been worn in the work, but it was not absorbed so as to become a component part of the construction. (*Chambers* v. *Vassar's Sons & Co.*, 81 Misc. 562; *Black Co.* v. *Surdam Holding Co.*, 140 id. 113.)

(D) *Hardware, picks, shovels, rubber hose, small tools and equipment.* These materials may or may not be lienable depending upon the proof as to whether or not they came into direct physical contact with the construction work, and whether or not they were consumed in the work. As stated above, under the heading gasoline, etc., the test is were these materials in physical contact with the construction, " primarily, and not mediately, absorbed and included in it? " Were they absorbed by direct action in the construction? (*Shultz* v. *Quereau Co., supra.*)

A steam shovel, an engine and boiler, picks, crowbars and the like are tools and equipment which survive the work and remain the useful property of the owner. Such items of a road contractor's plant are not lienable. (*Troy Public Works Co.* v. *Yonkers, supra.*) But if shovels and other equipment furnished the contractor for the particular work are actually used up during the job, by physical contact with the work of construction, so as to become valueless, then they may be said to have been consumed by the work of construction and lienable.

In the *Shultz Case* (*supra*) there is a quotation from a Massachusetts case, which states the distinction between coal burned in engines, and materials such as shovels consumed by use in the removal of earth for the construction: " We are of the opinion that there is a plain distinction between materials so used, and materials that enter directly into the work and become part of it, or *'those that are consumed by being applied directly to substances to be moved or changed to make a place for the structure, or be incorporated into it.*"

(E) *Freight.* Railroad freight bills for hauling material actually used and consumed in the construction work are lienable. The Lien Law is to be construed liberally to secure the purposes thereof. (§ 23.) If the trucking of sand and fill to the job is lienable, the labor of transportation by other means ought to fall into the same category. The cost to the contractor for cement is the same whether the manufacturer's price includes delivery or not. If it does not include delivery, it would be a lesser price corresponding to the cost of delivery. If the cement manufacturer had sold the cement at a delivered price, he would have been entitled to a lien for the agreed price. If a railroad bears the labor cost of transportation, it should be allowed the lien in order to secure the beneficial interests and purposes of the Lien Law. In *Upson* v. *United Engineering & Contracting Co.* (72 Misc. 541) there is an expression (at p. 553) by a great judge that on a claim for freight, " lienability of which is doubtful and [is] to be sustained only by the most liberal construction of the law." If the freight charge is for anything other than materials consumed by the improvement, such as the transportation of the plant, it would not be lienable. But liberal construction has decreed the trucking of materials lienable. No distinction should be made between hauling by railroad cars and by trucks. If a truck had been sent all the way to the cement manufacturer's plant and had brought the cement to the job it has been decided that a valid lien could be filed therefor.

(F) *Repairing machinery and parts.* Work done by an independent firm in repairing the machinery comprising the contractors'

plant and furnishing parts for the machinery in connection with the repairs is not lienable. It has already been pointed out that the contractor was under a duty to furnish the necessary plant. This duty required him to keep it in repair. Moreover, the plant is not absorbed by the work, and does not become a component part of it. The plant is taken away when the work is completed.

*Priority and parity.* Section 25 of the Lien Law, as amended and in effect when all of the liens or assignments were filed, settles these questions.

Liens for laborers' wages have preference as a class over other liens without reference to the time when such laborers shall have filed their notices of liens (Lien Law, § 25, subd. 3), and as between labor lienors there is no priority. (Lien Law, § 25, subd. 4.)

Material lienors have no priority as between themselves and any moneys available for distribution among lienors of this class shall be distributed *pro rata* in accordance with their respective valid liens. (Lien Law, § 25, subd. 4; *Dwelle-Kaiser Co.* v. *Frid,* 233 App. Div. 427.)

All the assignments were made and filed subsequent to the filing of the first lien. Therefore, the assignees for the purpose of determining their proportionate share of moneys available for distribution are treated as lienors having a lien to the extent of advances made. (Lien Law, § 25, subd. 1.)

*Validity of assignments.* Assignments for laborers' wages performed, for trucking done and for materials furnished forming a component part of the improvement are valid, even if the trust clause mentioned in section 25, subdivision 5, is not made a part of the assignment.

Assignments arising out of a past indebtedness not connected with the improvement, or given for non-lienable claims, even though such claims grow out of the improvement, and assignments providing for future advances of moneys that do not contain the trust clause required by section 25, subdivision 5, are invalid.

Substantiation of the foregoing may be found in reason and authority.

The contractor's right to assign money due on a public improvement contract is recognized by the Lien Law, section 16 *et seq.,* and the courts have formerly held that assignments for labor and materials, for moneys advanced, or for any valuable consideration were valid. (*Vanderlip* v. *Walker,* 144 Misc. 629; *Dick Sand Co.* v. *State of New York,* 137 id. 622.)

Prior to the recent amendment of the Lien Law the courts held

that such an assignment took precedence over liens subsequently filed. (*Anderson* v. *Hayes Co.*, 243 N. Y. 140; *Grant Portland Cement Co.* v. *State of New York*, 232 id. 395; *Riverside Contracting Co.* v. *City of New York*, 218 id. 596.)

Until the amendment of section 25 of the Lien Law in 1930 there was no requirement in the Lien Law or elsewhere that the consideration for an assignment must be labor or materials that went into the work, and even now the requirement is only by implication.

Since an assignee is now treated as a lienor (Lien Law, § 25, subd. 1), and given the right to share in the fund *pro rata* with other lienors, notwithstanding the date of filing (Lien Law, § 25, subd. 4), the Legislature intended by enacting subdivision 5 of section 25 to guard against the depletion of the fund by assignments given for other than a lienable consideration.

Subdivision 5 of section 25 of the Lien Law (as amd. by Laws of 1930, chap. 859) is as follows: "Every assignment of moneys, or any part thereof, due or to become due under a contract for a public improvement shall contain a covenant by the assignor that he will receive any moneys advanced thereunder by the assignee as a trust fund to be first applied to the payment of claims of subcontractors, architects, engineers, surveyors, laborers and materialmen arising out of the improvement, and to the payment of premiums on surety bond or bonds filed and premiums on insurance accruing during the making of the improvement, and that he will apply the same to such payments only, before using any part of the advances for any other purpose."

This subdivision deals only with assignments providing for the advancement of moneys. It has no application to assignments given for labor performed and materials furnished that went into the improvement. To have such last-mentioned assignments contain the trust clause would effect no useful purpose. They would simply be incumbered with idle language. The sensible construction is that all assignments providing for the advancement of moneys to be valid under section 25, subdivision 5, of the Lien Law must contain the trust covenant, and that all other assignments to be valid under the same section must be for advances of work and material that are lienable. "Advances" may be money, real property or personal property. (Lien Law, § 2.) Such construction carries out the intent that the advantages of the Lien Law are for him whose labor or material goes into the improvement, and would prevent assignments given for obligations apart from the work sharing on a parity with assignments given for moneys advanced for the work, or for labor and materials that have gone into it.

The decision in *Lanna* v. *Gates, Inc.* (142 Misc. 171) is not in

conflict with these views. In that case the referee dealt with an assignment which did not contain the trust clause, and the consideration of which was moneys that had been loaned to the contractor.

Indeed, the same referee, himself, in a later decision (*Vanderlip* v. *Walker*, 144 Misc. 629) distinguishes an assignment for work or material actually furnished from one to secure an indebtedness to arise in the future and asserts that the former presents a different situation from that found in *Lanna* v. *Gates*.

In this late decision, *Vanderlip* v. *Walker*, the referee also holds that the assignees and lienors stand on an equality, and share with each other *pro rata* in the fund.

*The surety's liability.* The bond is not only a completion bond, but also a promise to pay for all labor and materials used in carrying out the contract. The conditions of the bond are: " That the said principal, Spencer B. Randall, shall well and truly keep and perform all the agreements, terms and conditions of said paving contract on his part to be kept and performed, *and shall also pay for all labor performed or furnished and for all materials used in the carrying out of said contract.*"

The city in its answer asks judgment that the surety be required to pay for all labor and materials used in the carrying out of the contract. Any person having a claim within the meaning and intent of the language of the bond may take advantage of the city's demand against the surety, and recover its claim directly from the surety. (*Johnson Service Co.* v. *Monin, Inc.*, 253 N. Y. 417.)

Certainly the bond creates a liability upon the part of the surety to pay all claims for labor and material that are lienable, whether liens for such claims were filed or not. The question is whether the language of the bond is broad enough to create a liability for labor performed or furnished and material used in the work for which a valid lien may not be filed.

The language of the bond is broader than that of the Lien Law describing the labor and material for which a lien may be filed. The Lien Law, section 5, provides: " A person performing labor for or furnishing materials to a contractor, * * * shall have a lien * * *."

As already pointed out, the courts in construing this language have held that the labor or materials must form a component part of the construction to be lienable.

The language of the bond, " all labor performed or furnished," does not require personal performance of the labor, as the wording of the Lien Law, " a person performing labor," imports. More-

over, according to the bond the labor may be performed or *furnished.* Again, the words in the Lien Law, " furnishing materials to a contractor," have narrower significance than the words in the bond, " all materials used in the carrying out of said contract." The words " all materials used in the carrying out " import more than the materials that become a component part of the construction improvement. Therefore, any labor performed or furnished as a necessary incident to the work, though not such as to be lienable, and any materials used necessary in connection with the execution of the work, even though not lienable, are within the meaning and intent of the language of the bond. Thus, labor furnished and parts used in repairing machinery and moneys advanced for payrolls fall within the provision of the bond. It was the intent of the city that the contractor or his surety should pay for all labor and materials that were used in the execution of the work, so that when the work was completed, and the contract price paid, no injustice would come to any one who had contributed either labor or materials toward its construction.

There are a few other questions of law each applicable to only one claimant. These questions will be discussed later, each under the title of the claim to which it has application.

Application of the foregoing rulings of law to the liens and assignments under their separate numbers and names and where necessary decision of fact is as follows:

1. *Leflar & Glenar.* Lien for gasoline, oil and grease furnished Arclous Biron, subcontractor. Two hundred and eighty-four dollars and twenty-five cents thereof is allowed as an equitable claim against the amount due Arclous Biron, on his lien, after the payment therefrom of the preference labor liens 2–9. The Official Purchase Company, assignee of Biron, had notice of this claim when it took the assignment of the Biron lien. While the gasoline, oil and grease are not lienable, they are nevertheless materials used " in the carrying out of said contract," and the balance of the claim, in amount $397.30, is allowed as against the surety company.

2–9. *Willard Swartz et al.* Labor liens against Arclous Biron, subcontractor. Entitled to preference and allowed in full as the first payment from the amount due Arclous Biron on his lien.

10. *Joseph Walker.* An assignment given for crushed stone, hauling, labor and rental of machinery. Allowed, except the $300 item for rental of machinery, as against the balance of the fund due the contractor, to share *pro rata* with other liens after the payment of the preference labor liens therefrom, and the balance of this claim, after the deduction of said *pro rata* amount to be

paid from the fund due the contractor, is allowed as against the surety company. The item rental of machinery, $300, disallowed as against the fund, also as against the surety company.

11, 13. *Lone Star Cement Company.* Assignments for cement. Allowed against the fund and the surety company in the same manner as No. 10.

12, 25. *Arthur J. Stockamore.* Assignments for moneys loaned. Part of the money was loaned prior to the date of the contract and was not used in connection with the improvement. The second and third loans, aggregating $2,800, were used for labor payrolls. Inasmuch as the assignments were not given to cover future advances of money, section 25, subdivision 5, of the Lien Law is inapplicable. Moreover, the agreements to make the loans for payrolls were made and the loans themselves were made and the moneys loaned were used for payrolls before section 25, subdivision 5, as amended, went into effect. Allowed in amount $2,800 as against the fund and the surety company in the same manner as No. 10.

14. *Laverne P. Butts.* Lien for pipe and fittings. Allowed in full as against the fund and the surety company in the same manner as No. 10.

15. *National Surety Company.* Assignment for moneys due and to become due. Inasmuch as the assignee is the surety, it would gain nothing in having this claim allowed, because the amount it received from the fund would have to be paid back under its bond to the lienors and assignees, the fund being insufficient to pay the allowable liens and assignments in full, and the surety being liable for the balance thereof. Moreover, to allow the assignment would work a forfeiture of the bond *pro tanto.* Furthermore, the assignment is invalid because it does not contain the trust clause as required by section 25, subdivision 5, of the Lien Law. Subrogation is claimed by the surety company, but this equitable doctrine is not invoked when equal or superior rights of others are involved. (*Bell* v. *Greenwood,* 229 App. Div. 550.) The cases cited by the surety company do not apply. *Johnson Service Co.* v. *Monin* (253 N. Y. 417) decides that, as between the surety company and the contractor, the former is entitled to subrogation and does not decide that the surety company may have subrogation as against valid liens or assignments. In *Arrow Iron Works* v. *Greene* (139 Misc. 265) the contractor defaulted and the surety company became entitled to a fund which had never been earned by the contractor and was, therefore, not applicable to the payment of liens and assignments. The assignment is disallowed as against the fund.

16. *Maguire-Tymeson Company.* Lien for hardware, tools and

equipment in amount $491.95, of which $11.68 is for items not connected with the work. The articles that were worn out in the performance of the work are as follows: 5 DH Fox shovels, $6.25; 4 DH sq. pt. shovels, Wharton, $5; 3 DH sq. pt. shovels, Wharton, $3.75; 100 feet rubber hose, $26; radiator hose, 17 cents; 1 trowel, 85 cents; 3 pair high top boots, $16.50; 6 DH sq. pt. Realite shovels, $7.50; 1 pair rubber boots, $5.50; 50 feet Leader hose, $2.50; 2 pair boots, $11; 6 DH sq. pt. Fox shovels, $7.50; 1 pair boots, $5.50; 2 DH sq. pt. shovels, $2.50; 1 pair boots, $5.50; 6 DH sq. pt. shovels, $7.50; 2 DH sq. pt. Wharton shovels, $2.50; 2 DH rd. pt. Fox shovels, $2.50; 50 feet Leader hose, $7.20; 12 feet water hose, $7.20; 1 DH rd. pt. Realite shovel, $1.25; 2 DH sq. m. shovels, $2.50; 5 DH sq. m. shovels, $6.25; half doz. DH rd. pt. Fox shovels, $7.50. These articles amount to $150.42. Allowed in amount of $150.42 as against the fund and the surety company in the same manner as No. 10. The balance of the lien, in amount $329.85, is allowed against the surety company.

17. *Art Stone Company.* Lien for materials. Allowed in full as against the fund and as against the surety company in the same manner as No. 10.

18. *Welsh & Grey Lumber Corporation.* Assignment for materials. Allowed in full against the fund and the surety company in the same manner as No. 10.

19. *Arclous Biron.* Lien for trucking, in amount $682.05. Amount due stipulated at $681.55, in which amount it is allowed as against the fund and the surety company in the same manner as No. 10. From this amount allowed $397.30 is directed to be paid to Willard Swartz and others, lienors, Nos. 2–9, inclusive. The balance, $284.25, is directed to be paid to Leflar & Glenar to apply upon their claim.

20. *Official Purchase Corporation.* Lien for trucking. Allowed in full as against the fund and the surety company in the same manner as No. 10.

21. *Almeda Moynehan.* Assignment for materials and trucking in amount $1,775.25. Amount stipulated at $1,468.05, which sum is allowed against the fund and the surety company in the same manner as No. 10.

22. *Travis & Ockzo.* Lien for repairing machinery and parts. Disallowed as a lien against the fund. Allowed as against the surety company.

23. *Henry S. Gage.* Lien for trucking, $162.75. Amount due stipulated at $149.04, which sum is allowed against the fund and the surety company in the same manner as No. 10.

24. *Snyder & Way Lumber Company.* Lien for materials.

Allowed in full against the fund and the surety company in the same manner as No. 10.

26. *Robert Trevett.* Lien for trucking, in amount $334.39. Amount due stipulated at $279.89, which sum is allowed against the fund and the surety company in the same manner as No. 10.

27. *John Young.* Assignment in amount $4,000 for rental of machinery. Disallowed as an assignment under the Lien Law. Disallowed as against the surety company. By a liberal interpretation of the words "labor and materials" rental may not be embraced within their meaning. Labor is human effort either physical or mental, and material is the substance out of which anything is made.

28. *Miller Equipment Company.* An order to pay $1,555.50, duly filed. It is made up of the following items: 1 dozen Toledo torches, $18.50; repairing back filler, $146.42; repairing Keystone, $163.05; renting machine, $1,108.86; renting forms, $110. The items are not lienable. The order is disallowed as an assignment against the fund. The first three items, aggregating $327.97, are allowed as against the surety company.

29. *George Wart.* Lien for labor, $50. Allowed in full as a preferred labor lien.

30. *Calvin Travis.* Labor lien, $37. Allowed in full as a preferred labor lien.

31–43. *Joseph Singer* and others. A certificate that wages are due the persons named therein and an assignment of sufficient moneys to pay them. Dominick therein mentioned is Dominick Morgan, and Blackie is Dominick Jordan. The amount of $50 stated therein to be due George Wart and the amount of $36.50 stated therein to be due Calvin Travis are duplications of labor liens Nos. 29 and 30. The balance of the amounts due laborers as therein stated are allowed against the fund as preferred labor liens.

44. *Fonda, Johnstown and Gloversville Railroad Company.* Assignment for freights. Allowed in full against the fund and the surety company in the same manner as No. 10.

45. *Morrell Vrooman, Inc.* Lien for labor, materials and rented equipment, $1,093.21. Amount agreed upon is $733.21, all for rental of machinery except $62.20, which was for materials. Disallowed as to the rental item. Allowed in amount $62.50 as against the fund and the surety company in the same manner as No. 10.

46. *Pioneers Builders Supply Company.* Lien for materials. Allowed in full against the fund and the surety company in the same manner as No. 10.

47. *Frank Clemente.* Lien for labor. Allowed in full as a preferred labor lien.

48. *Ross F. Williams.* Lien for trucking. Allowed in full as against the fund and the surety company in the same manner as No. 10, and payable to C. E. Lair, assignee.

49. *Joseph L. Sandfordt.* Lien for material and labor. Allowed in full as against the fund and the surety company in the same manner as No. 10.

50. *Fultonville Foundry Company.* Lien for materials, $180. Amount stipulated at $162. Allowed at $162 as against the fund and the surety company in the same manner as No. 10.

51. *Philip Carey Company.* Lien for materials. Allowed in full as against the fund and the surety company in the same manner as No. 10.

52. *William J. Dunham.* Lien for labor. Allowed in full against the fund as a preferred labor lien.

53. *J. P. Dugan & Co., Inc.* Lien for rental of forms, etc. No appearance, and no proof offered. Disallowed.

54. *Peter Ravanzzini.* Lien for labor in amount $272.70. Amount due is $102.74. Allowed at $102.74 as a preferred labor lien.

55. *Board of Water Commissioners.* Lien for water furnished. Allowed as a credit to the city of Johnstown.

56. *Briggs Brothers.* Lien for gravel, etc. Allowed in full as against the fund and the surety company in the same manner as No. 10.

57. *S. Vedder & Co.* Lien for labor and materials, $194.05. The items are as follows: Hauling brick, $147.50; labor on machinery and equipment, $26; parts and oil, $20.55. Allowed as to the hauling item, $147.50, as against the fund and the surety company in the same manner as No. 10. The balance in amount, $46.55, allowed as against the surety company.

58. *Tryon Oil Company.* Lien for materials. This lien is for the same materials as the assignment next following. At the trial claimant elected to stand upon the assignment. Lien disallowed.

59. *Tryon Oil Company.* Assignment for oil, grease, etc. Disallowed as an assignment under the Lien Law. Allowed in full as against the surety company.

60. *Great American Indemnity Company.* Lien for compensation and liability insurance premiums. Defaulted in answering. No appearance upon the trial. Insurance premiums not lienable. Disallowed.

61. *Concrete Steel Company.* Lien for materials. Filed too late. Defaulted. Disallowed.

62. All claimants not in default whose claims have been disallowed are entitled to a judgment therefor against the contractor.

The remaining question to be considered is the amount due the contractor from the city.

The extra work finally claimed in the contractor's brief is as follows:

| | |
|---|---:|
| 1. Additional yardage of concrete | $10,250 00 |
| 2. Sand filler | 1,205 14 |
| 3. Stone filler | 1,895 33 |
| 4. Forms | 1,490 93 |
| 5. Sewer across Main street | 802 75 |
| 6. Culvert, Market and Perry streets | 130 00 |
| 7. Looking for sanitary sewer | 136 40 |
| 8. Catch basin, Market and Perry streets | 23 05 |
| 9. Catch basin, Washington and Perry streets | 101 77 |
| | $16,055 37 |

*Additional yards concrete.* This claim seems to be practically abandoned in the contractor's brief. It is there stated: "This item, however, rests on a calculation of cement purchased and used, but accurate evidence of yardage could not be obtained, due to the varying depths of concrete, because of the uneven sub-base. Some extra allowance on this item would seem justified by the proof."

The contractor calculated the yardage on the basis of the amount of cement used but, curiously, he did not know the percentage of the ingredients of the concrete mix which by his contract he agreed to and actually did furnish. He used in his calculation a 1–2–4 mix, having a factor of 1.46, whereas the contract provided for a 1–1½–3 mix, having a factor of about 1.85. The city engineer used a 1.84 factor, thereby slightly favoring the contractor and applying this factor to the known length, breadth and the measured thickness of the pavement he accurately computed the yardage and the full amount thereof was allowed in his final estimate. This claim is wholly without merit.

As to the other claims, items 2–9, it appears that shortly after the work was completed the contractor made out a typewritten statement denominated "Randall's statement extra work" (Defendant's Exhibit 30) and submitted it to the city engineer and assistant city engineer. The contractor and the engineers went over it, item by item, and finally agreed upon a sum as the amount due upon each claim. The sums thus agreed upon were placed in the engineer's final estimate and allowed by the city. Perhaps such an agreement should not be treated as an account stated, but

it is strong evidence that the amounts allowed by the city are correct.

In determining the claims for extras certain provisions of the proposal, the specifications and the contract should be considered.

Quantities as determined by the engineer are " final, conclusive and binding upon the Contractor."

There are provisions concerning catch basins, storm sewer, repairing existing concrete foundation, forms and that " unit bid " prices shall apply to additions.

None of the claimed foregoing extras has been ignored or disallowed by the engineer. The sole issue is as to quantities and prices. Quantities must be taken as determined by the engineer, in the absence of evidence of gross abuse, and prices must be unit prices where the extra claimed is a kind of work for which a unit price is fixed by the contract. The only items not covered by unit prices are No. 2, sand filler, and No. 3, stone filler.

*Sand filler.* The sand filler leveling course was put into the center strip of the street where the ties of the street railroad had been taken up, and where the concrete foundation had been broken in removing the rails and ties. It varied in thickness from two to five inches. It was rolled with a hand roller. Larger depressions were filled with a stone-leveling course.

The dispute is as to the quantity and the cost of manipulation. The engineer and the contractor agreed that the cost of the sand delivered at the job was $1 per cubic yard. The engineer figured 575.3 cubic yards computed from a " sample lay." The contractor claimed a greater quantity. The engineer testified: " As I recall it, I raised the yardage, in other words, we split the difference upon it. I raised the loam fill quantity enough to make that amount of money and we did the same thing upon the Stone fill. * * * We finally agreed upon the two quantities, in each of which was more than I measured."

The quantity thus arrived at must be accepted not only because it was agreed upon, but because the contract provides that quantities as determined by the engineer are " final, conclusive and binding."

The engineer calculated the price per yard as follows: The cost of the sand, $1 per yard; manipulation, 30 cents; profit, 26 cents, making $1.56 per yard. He increased it to $1.75 in the supplemental agreement. The engineer testified: " We finally agreed upon the price included in the supplemental agreement."

At the trial the contractor claimed $2,211.92, made up as follows: Labor, $1,052.90; 792 cubic yards sand, at $1, $792; compensation insurance, $36.11, and fifteen per cent profit, $300.91. Thus it appears his claim for spreading the material is 792 into $1,052.90,

or about $1.33 per yard. And if the quantity taken is a split between the 575.3 and 792, viz., 683.65, then the manipulation charge is about $1.58 per yard. In cost of manipulation the engineer and the contractor are over $1 per yard apart. The engineer testified that he took a sample day and kept track of the number of men who were spreading and the number of yards spread to arrive at the cubic yard cost of manipulation. A cost of more than $1 per yard for spreading does seem, as the engineer testified, " excessively high," especially since the sand was partially· spread by the trucks when dumping. The contractor does not produce daily entries in time books to prove his labor cost for this work. The entries in the book that he does produce were made in some instances a week after the labor was performed. He claims the foreman kept track of the hours on a piece of paper which was not preserved. Such book entries are unsatisfactory proof. The engineer made a fair allowance for this item, in an amount which met the approval of the contractor, and which he would have accepted had he been in a position with his creditors to do so.

*Stone filler.* This claim is of the same calibre as the sand filler item and much that has been said in regard to the sand filler claim is applicable here. The contractor's original claim for this work (Defendant's Exhibit 30) and his testimony do not agree either as to quantity or price. His original claim for labor was $702. In his testimony and in his Exhibit 27, he claims $1,831.75 for labor. He does not produce original books of entry. His labor charge is over $3 per yard for spreading. The engineer testified that fifty per cent of the stone was spread by one man and that the stone was partly spread by the dump trucks, and that $1 per yard was a liberal allowance for manipulation. The engineer allowed $1.75 per yard for the cost of the stone, having determined the cost from the contractor's own bills for material, allowed twenty per cent profit and an extra for contingencies, and figured in sand filler rolled into the stone and the cost of manipulation was determined from a sample day of handling. After a conference with the contractor the engineer increased the quantity beyond that shown by his measurements and made the final figure $3.25 per yard, which was agreed to by the contractor.

*Forms.* The contractor claims that additional expense was occasioned by the change in the contract substituting concrete for brick in the middle strip occupied by the trolley tracks. This change was at the contractor's request and following his threat to forfeit his deposit if it was not made. This request was made because the contractor believed the change would effect a substantial saving in his costs, which competent witnesses testified was the fact.

No claim for this item was made by the contractor in his initial statement of extras (Defendant's Exhibit 30), and no claim is justified by the proof.

The extra is based upon the contention that if the track had not been removed the center forms could have been braced against the rails, thus obviating the necessity of driving through the subbase iron pins or stakes to hold the forms in line. But the contract provides: " The forms shall * * * be staked securely to line and grade * * * by using at least three bracing pins or stakes to each ten foot lengths of side form."

And there is no proof that this contract provision was canceled or modified. Therefore, the contractor had no right to expect to save the cost of bracing pins and driving them through the subbase by bracing the forms against the rails. If the contractor had had six-inch steel forms, as the contract required, he would have experienced no difficulty in placing and bracing them and would not have had to purchase lumber for forms which he claims as a part of this extra item.

*Sewer across Main street.* In the contractor's brief it is stated: " The sewer extension across Main Street is entirely an extra item, and not covered by the original contract and no unit price is involved."

If this were so there would be some merit in the claim, for the work was at a busy corner and traffic, water and sewer pipes, telephone and electric subways interfered with its economical performance. But in the contract, page 20, under the heading " Storm sewer," it is provided that the contractor shall furnish and lay pipe as shown on the plans, " or as ordered by the Engineer," and further that the price bid shall cover the furnishing and laying of the pipe and all materials and incidentals thereto, and that all excavation in connection therewith shall be paid for as " earth excavation." The engineer allowed for the pipe and the excavation at the unit prices and added $91 for breaking out the telephone conduit. Considering the location and the character of the excavation payment of the unit price on earth excavation would probably not cover the actual cost. However, when $91 extra was added the amount allowed totaled $233.20, which the engineer testified was the reasonable value of the work. In any event, it was more than the contract price, which must control.

6. Culvert, Market and Perry streets.

7. Looking for sanitary sewer.

8. Catch basin, Market and Perry streets.

9. Catch basin, Washington and Perry streets.

All of these items are covered by the unit prices for excavation

and second class concrete set forth in the contract and were allowed as such by the engineer. In addition he allowed $160 because some of the excavation was wet.

The contractor was ill-equipped with money, plant and experience to do this work. It is not surprising that he suffered a loss. His loss was not occasioned by the city or its agent. Indeed, the city engineer was eminently fair with him. The amount due the contractor from the city is that shown in the engineer's final estimate, viz., $33,615.77.

It is suggested that the city attorney prepare and submit to the other attorneys a proposed decision, which may include an allowance of one bill of costs from the fund to each attorney appearing for one or more parties successful as against the fund and one bill of costs against the surety company to each attorney appearing for one or more parties successful as against the surety company. Settlement of the decision may be noticed for December 27, 1932, at ten A. M., at my chambers, at which time proposed requests to find may be presented.